Harold L. KORMAN
v.
The UNITED STATES.
No. 460–70.

United States Court of Claims.
July 14, 1972.

————◆————

Glenn R. Graves, Washington, D. C., attorney of record, for plaintiff.

Lawrence S. Smith, Washington, D. C., with whom was Asst. Atty. Gen. L. Patrick Gray, III, for defendant.

Before COWEN, Chief Judge, and DAVIS, SKELTON, NICHOLS, KASHIWA and KUNZIG, Judges.

ON PLAINTIFF'S MOTION AND DEFENDANT'S CROSS-MOTION FOR SUMMARY JUDGMENT

DAVIS, Judge.

By the Fall of 1968 Harold L. Korman had served twenty years as a career employee of the Intelligence Division of the Baltimore district of the Internal Revenue Service, rising on the ladder from special agent to group supervisor to assistant chief and then to acting chief. In general he had performed well, and there was and is no suggestion of reprehensible conduct or corrupt motive on his part at any time. His formal title was Assistant Chief, Intelligence Division, and his grade was GS–14.

In October 1968, the Service began an adverse personnel proceeding against him, founded on the basic charge that for some ten years "you failed to perform your duties in a manner reasonably expected of you with respect to Baltimore racketeer Philip 'Pacey' Silbert."

The letter of proposed adverse action divided this charge into three specifications (with numerous subspecifications giving detailed instances): (1) failure to include Silbert's name in the In-Service Racketeer program until told to do so by the District Director, although plaintiff admitted that he knew Silbert to be one of the leading "numbers operators" in Baltimore; (2) failure to take appropriate or effective action following up significant information and leads concerning Silbert's activities; (3) failure to ensure that a consolidated file on Silbert was maintained in the proper Intelligence Division records so that memoranda and information on Silbert would be readily available. All three specifications covered the period from 1958 to 1967.

The case proceeded through the prescribed administrative channels. After responses by plaintiff, but without a hearing, the Regional Commissioner of the Service sustained the charge and the specifications (excepting two of the subspecifications). The sanction imposed was demotion (effective early in April, 1970) from Mr. Korman's post as Assistant Chief, Intelligence Division (in the Baltimore district), grade GS–14, step 5, to the job of grade GS–13, step 10, Criminal Investigator.[1] The actual

---

1. Plaintiff was also required to transfer from Baltimore to Bailey's Crossroads, Va., but this side-effect of the demotion is not claimed as an adverse action within the purview of the Civil Service Commission's appellate jurisdiction or this court's authority to grant back-pay.

loss in pay was small, but the intangible effect of the downward change in status was obviously sharp.

On plaintiff's appeal to the Civil Service Commission, a full hearing was held and the regional appeals examiner upheld the agency's decision (deleting some of the remaining subspecifications). The Commission's Board of Appeals and Review affirmed, limiting the beginning of the time covered by the charge to late 1963 or early 1964. The cumulative result of the administrative consideration by the Service and the Commission was to whittle down the time-span blanketed by the charge of failure to take proper action with respect to Mr. Silbert to the period from October 1963 (when plaintiff became Assistant Chief of the Intelligence Division) to February 1967 (when plaintiff, at his superior's direction, did finally recommend Silbert's classification as a "racketeer").

Early in 1970, about nine months after his demotion and transfer, plaintiff voluntarily retired from the Internal Revenue Service, and in December of that year he began this suit, alleging lack of substantial evidence to support the charge, as well as some procedural defects in the Commission proceedings. The reduction in pay for which he sues is only about $350 (covering the nine months he remained in active service after the effective date of his downgrading), but the psychic hurt is plainly much deeper. The case comes before us on cross-motions for summary judgment, both resting on the administrative record.

### I.

The first topic concerns the nature of the charge and whether that accusation is a good ground for discipline "to promote the efficiency of the service"—the controlling standard under the Civil Service Regulations (Part 752–B).

The overall charge is that plaintiff failed to perform his duties "in a manner reasonably expected of you with re-

spect" to Silbert. During the time for which this complaint was upheld—while plaintiff was Assistant Chief and Acting Chief—this duty was relevantly defined, in significant part, by the Internal Revenue Manual. Section 9411 of the Manual, setting forth guidelines and responsibilities for the Racketeer Program, contains two pertinent provisions:

(2) For purposes of this program, a racketeer is defined as any person who is reasonably believed to be: engaged in organized criminal activity or notorious or powerful with respect to criminal activities in the community in which he resides or operates * * *

(10) The Chief [Intelligence Division] is personally responsible for classifying as racketeers the taxpayers he considers as meeting the definition of a "racketeer" as set forth in IRM 9411: (2) [supra]. Classification should be postponed in any doubtful case until additional information is received. The Director, Intelligence Division, or the Assistant Regional Commissioner may identify additional taxpayers as racketeers, and the Chief will include such names in the racketeer classification.

■ Under those paragraphs, discretion is vested in the Chief only as to delineation of a taxpayer as a "racketeer". That official is "personally responsible" for placing in the "racketeer" classification those taxpayers he considers as meeting the definition of "racketeer" set forth in paragraph 2, supra; the only reason given for postponing classification is to obtain more information if there is doubt whether the taxpayer does meet the criterion. Once the Chief reasonably believes a taxpayer to be a "racketeer", it is his responsibility so to designate him. It is not in the Chief's discretion to consider alternative procedures for evaluation or action with respect to the individual believed to be a "racketeer", as substitutes for inclusion in the Racketeer Program. The Service has itself made the definite choice to

deal with such persons as part of its structured program.

■ Another question is whether paragraph (10), *supra*, applies to plaintiff in his capacities as Assistant Chief and Acting Chief. For a long period, he served as Assistant Chief and for three consecutive months in 1965 as Acting Chief.[2] He contends that classification of an individual as a "racketeer" was exclusively the duty of the Chief. Even if this were so, plaintiff would not thereby avoid responsibility for failing to classify Silbert while serving as Acting Chief in 1965. Moreover, we cannot agree that, because the then Chief was disciplined for leaving Silbert's name off the "R" file[3] (among other deficiencies), plaintiff cannot be demoted for the same omission. There is nothing in paragraph (10) which justifies reading the phrase "personal responsibility of the Chief" as "exclusive responsibility"; the more sensible interpretation is that other high officials, sharing the executive functions in the Intelligence Division, could, and would in appropriate cases be expected to, suggest inclusion of the taxpayer's name in the program. This was the Civil Service Commission's understanding, and there was ample evidence to support it in the administrative record. The Assistant Chief shared and participated in the obligation, and was expected to do what he could to have a "racketeer" placed in the Program.

■ A violation of this specific mandate of the Internal Revenue Manual would certainly warrant appropriate disciplinary action. Sanctions against employee transgressions of rules governing their conduct and duties have been so clearly considered as promoting service efficiency that our opinions do not seek to elaborate the obvious connection. See, *e. g.*, Indivigio v. United States, 299 F.2d 266, 156 Ct.Cl. 241 (1962), cert.

denied, 371 U.S. 913, 83 S.Ct. 260, 9 L. Ed.2d 173; Rubin v. United States, 150 Ct.Cl. 28 (1960); Duley v. United States, 284 F.2d 687, 149 Ct.Cl. 153 (1960). No organization could continue to function adequately, or even survive, if its members could disobey with impunity the controlling rules.

■ In addition to the provisions of the Manual, plaintiff's conduct of his office could be measured against the more general requirement of judgment inherent in the grade and position he held. Reasonable adverse action against a high official who exercises or displays bad judgment (in a significant aspect of his work) likewise promotes the efficiency of the service. *Cf.* Hoppe v. United States, 136 Ct.Cl. 559, 564 (1956), cert. denied, 355 U.S. 816, 78 S. Ct. 19, 2 L.Ed.2d 33 (1957); Salter v. United States, 412 F.2d 874, 876–877, 188 Ct.Cl. 524, 528 (1969). Plaintiff's assignment was responsible and sensitive, involving as it did the supervision of tax fraud investigations. Exercise of sound judgment in the material phases of that activity can be deemed an essential prerequisite to continuance in the post.

We have no difficulty, therefore, in holding that the charge against Mr. Korman, if sustained by substantial evidence, would support the imposition of an appropriate penalty.

## II.

In surveying the evidence for the administrative finding that the charge was proved, it is important that the case does not concern the exercise of discretion in deciding whether an individual meets the definition of "racketeer" under Internal Revenue Manual § 9411: (2), *supra*. Plaintiff has consistently admitted that he knew Silbert was a "racketeer" at least by 1960; he so stat-

---

2. From March 18, 1963, through October 26, 1963, Mr. Korman was Acting Assistant Chief; from October 27, 1963 through May 7, 1965, Assistant Chief; from May 8, 1965 through sometime in August, Acting Chief; from August 1965

until receipt of the notice of demotion in 1969, again Assistant Chief.

3. "R" file was another name for the Racketeer Program.

ed at an interview with IRS inspectors in 1968, and at his Civil Service Commission hearing in 1970; he has conceded the point, through counsel, in briefs and at the oral argument. There is also uncontradicted evidence that on September 2, 1965, a special agent recommended that Silbert's name be included in the "R" file and that a few months later Baltimore police referred plaintiff to an article identifying Silbert as a "racketeer." At the interview with the inspectors, Mr. Korman admitted that he had all the information necessary to place Silbert's name in the Program, certainly as of mid-1966. As indicated in Part I, *supra*, the plaintiff, believing Silbert to be a "racketeer", was required by the Internal Revenue Manual to classify him as such or at the least to recommend that designation.

Plaintiff's response is that the specification dealing with his failure to include Silbert's name in the "R" file (the lead-off specification) represents a "true but meaningless accusation." First, plaintiff says that an annual audit of the taxpayer's returns was already under way, equivalent to or more intensive than the bi-annual examinations conducted under the In-Service Racketeer Program. Then it is argued that plaintiff initiated an informal investigation, using a capable revenue agent and others in the audit division. Plaintiff decided to proceed in this manner, he says, because previous full-scale wagering tax cases against Silbert had proved fruitless and plaintiff was trying to build an income tax case; Silbert's gambling operation was such that it was difficult to make out a case against him and local agents were too well-known to be useful. We are also told that the Revenue Service never questioned the soundness of

plaintiff's informal approach nor has the agency produced anyone with intelligence credentials to criticize his plan.

The controlling point is, however, that under the Manual the decision to put Silbert's name in the "R" file is independent of any other steps taken—including the initiation of an informal investigation—and that Mr. Korman's omission to classify Silbert is not excused by his other actions, even if well-conceived. The problem lies not in what plaintiff chose to do, but in the mandatory duty he failed to fulfill.[4] The rule was on the books and plaintiff was bound to follow it. Where the issue was classification in the Racketeer Program, the Service did not prescribe that the Chief or Assistant Chief should consider various procedures and choose the alternative which, in his discretion, he deemed the best. For its own purposes, and quite reasonably, the Service expressly demanded the taking of this one step—classification as a "racketeer"—once there was reason to believe the taxpayer fell into that class.

Another explanation plaintiff gave in the course of the administrative proceeding was a combination of lack of time and a mistaken impression on his part that all recent income tax returns were necessary before classification could be made. In the meeting with Service inspectors in 1968 Mr. Korman stated that he exercised bad judgment in waiting for the previous year's tax return on Silbert. Several times in this 1968 interview he admitted, explicitly or in effect, that he had exercised bad judgment.[5] Throughout the questioning, while admitting faulty judgment, he protested his innocence of any bribe-taking or similar wrongdoing. His explanations and justifications were weak. At

---

4. Plaintiff contends that his superior (the then Chief of the Intelligence Division) through the early part of the period approved of his "informal" method of handling the case. Even if we assume that is so, contrary to the administrative findings, plaintiff does not show that the Chief approved of the failure to place Silbert's name in the "R" file.

5. See the administrative record (AR) 413–5, Q 118, 122; AR 436, Q 192; AR 445, Q 223–224. It should be noted that, before the questioning, plaintiff was given *Miranda* warnings and that he intelligently waived his right to remain silent and to consult an attorney.

the Civil Service Commission hearing, with the benefit of counsel, he changed his position as to the soundness of his judgment, and affirmatively sought to justify his actions. It is clear, however, that the Commission examiner, who had an opportunity to observe the demeanor of the witnesses and weigh their credibility, relied more heavily on the admissions in the earlier interview—as he had the right to do.

Similarly, we find that there was substantial evidence to support the findings on the other two specifications. On the complaint that Mr. Korman failed to ensure that appropriate action be taken to follow up information conveyed in an agent's (Koesky's) memoranda on Silbert, there is again conflict between plaintiff's testimony at the hearing and his statements at the interview with the inspectors. At the former, he testified that he had given the agent leads and suggestions both orally and through marginal notations on a document dealing with Silbert's mortgage. At the interview, plaintiff conceded his failure to make specific recommendations for follow up by Koesky or other agents involved in the investigation. The hearing examiner had the opportunity and the authority to decide that the earlier statements were more accurate, and to conclude, as he did, that "the efforts of Mr. Korman in this direction, as shown by the testimony and evidence contained in the record" do not reflect "a serious and genuine attempt on his part to ensure that proper and appropriate action was taken." There is also sufficient support for the findings that plaintiff failed to implement or follow up on reports of still other agents. Here, too, plaintiff made crucial admissions at the interview with the Service inspectors, which the Civil Service Commission could take into account.

The same is true of the third specification—failure to maintain a consolidated file on Silbert. Plaintiff knew of the practice to keep such a file in a central location, and this was certainly a reasonable requirement, so that all interested employees and officials could have easy access to the relevant current information. It is immaterial that plaintiff's failure to abide by this practice was not the product of improper motives.[6] The pure-in-heart who fail to follow instructions (or to exercise good judgment) are not cleared of all blame by their innocence of corruption.

■ We are satisfied, in short, that the charge against plaintiff of failing to perform his duties with respect to Silbert was adequately proved. We need not decide whether any particular specification or subspecification would be enough by itself. The findings, taken together, and the administrative record, as a whole, support the determinations that plaintiff breached the obligatory requirement of the Internal Revenue Manual that he take steps to classify Silbert as a "racketeer", and also that he failed to exercise the requisite sound judgment demanded of a supervisor with his responsibility.

### III.

Little need be said on the sanction. In upholding a removal for bad judgment in a high-level federal position, this court pointed out that "[a]nother remedy, such as demotion or transfer, might have been chosen and might have been better, but removal was not beyond the bounds of discretion in this case." Hoppe v. United States, *supra*, 136 Ct. Cl. 559, 564 (1956). In the present instance, the lesser penalty of a one-grade-demotion-plus-transfer was plainly

---

6. Silbert happened to be the brother-in-law of the then Commissioner of Internal Revenue (who had previously served as Chief Counsel), but there is no charge that plaintiff was moved by this particular factor. On the other hand, there is no proof that plaintiff's superiors directed or suggested that Silbert be given special treatment for this reason. There is likewise no showing of bias against plaintiff or of improper managerial motives in proceeding against him. *Cf.* Ciambelli v. United States, 198 Ct.Cl. —— (May 1972).

not arbitrary for the charge which was proved and is now sustained.

## IV.

█ Finally, we find no significant procedural deficiency. Reference is made to a statement of the Civil Service Commission examiner which, it is alleged, indicates that a prohibited *ex parte* investigation may have been made by the Commission.[7] There is no evidence to support the allegation, and it is clear to us that the "investigation" mentioned by the examiner was no more than an assembling of the files and a placing of the case in proper posture for the hearing, with an opportunity for plaintiff to see the agency papers.

█ We also disagree with plaintiff's other procedural contention—that the Commission applied a discriminatory standard as to hearsay evidence. The examiner was correct in overruling plaintiff's objection to inclusion of the 1968 interview in the record. It was a transcribed conversation, whose authenticity and accuracy is unchallenged. Mr. Korman's responses were admissions by him, following appropriate *Miranda* warnings. He testified at the hearing and was given the opportunity to try to explain his earlier admissions of bad judgment and the other statements in the interview.

█ Plaintiff complains that, at the same time, the Board of Appeals and Review ruled that the uncorroborated testimony of plaintiff as to his Chief's approval of the informal procedure as to Silbert was unsupported by other evidence. That testimony, self-serving and uncertain as to its accuracy, is obviously distinguishable from the admissions in the 1968 interview. But even assuming that the plaintiff is correct that it should have been considered, we have already observed that plaintiff's failure to

classify Silbert is not excused by his initiation of his own informal investigatory procedures (see also note 4, *supra*).

For these reasons, plaintiff is not entitled to recover. His motion for summary judgment is denied and defendant's cross-motion is granted. The petition is dismissed.

---

7., "We received from the employing agency copies of pertinent documents and records and the evidence relied upon by the agency to support the action. A representative of this office conducted an investigation, during which the appellant and his representative were given an opportunity to review the appellate file and to make comments thereon."